CAVANAUGH, Judge.
This suit is by the plaintiff against the defendant who had issued a policy of insurance covering the workman’s compensation liability of Frank Jameson, d/b/a Frank’s Rental Tools, for the maximum amount of compensation of $30 per week for a period of 400 weeks during the period of his disability. The plaintiff alleges that on April 20, 1951, while in the employ of Frank’s Rental Tools, and while acting within the scope of his employment and while performing services arising out of, incidental to and during the course, business and trade of his employer, he suffered accidental personal injuries when involved in a collision on one of the streets in the City of Lafayette; that the nature and character of the injuries suffered by the plaintiff were fracture of the second, third and fourth cervical vertebrae, with fusion of the anterior margin of the bodies of the second and third cervical vertebrae, associated with spur formation between the bodies of the third and fourth cervical vertebrae, complete loss of motion between the bodies of the second and third and fourth cervical vertebrae, in-tervertebral disc injury, with complete obliteration of the joint interspace between the seventh cervical and first thoracic vertebrae, with complete fixation of this articulation, moderate degenerative hyperthor-phic arthritic changes throughout all cervical vertebrae, crushing type injury of thorax, right, posterior with heeled fracture right twelfth rib, associated with spur formation, and approximately forty percent loss of hearing in both ears, together with permanent restriction of movement of the entire neck on either side.
The defendant, by answer, admits that the plaintiff suffered accidental personal injuries while in the employ of the insured and that the defendant had issued in favor of the insured its compensation liability insurance policy, but especially denied that plaintiff suffered any permanent disability to perform his usual work as a pipe stabber and that the defendant, for its insured, paid to the plaintiff compensation covering the period from the date of the accident to September 6, 1951, when plaintiff returned to his work and performed the same or similar work to that he was performing at the time of the accident; that it had paid to plaintiff all the compensation benefits due him from the date of the injury up to the time he returned to work, as well as all of the medical and hospital expenses incurred in the treatment and care of plaintiff until he was discharged as able to return to work by the attending physician, Dr. James Gilly. It prayed that plaintiff’s demands be rej ect-ed at his cost and his suit dismissed.
At the commencement of the trial of the case, plaintiff and defendant stipulated, through counsel, that the sole question presented on the trial of the case was the question of disability and that plaintiff was injured in the automobile accident during the scope of his employment, and that the defendant, insurer of Frank’s Rental Tools, plaintiff’s employer, had paid compensation to the plaintiff up to September 6, 1951.
The District Judge rejected the plaintiff’s demands and dismissed his suit, in which he held that the plaintiff was not totally and permanently disabled to do the same kind and character of work he was performing at the time of the alleged accident.
The plaintiff has appealed.
*116 ■The Trial Judge filed a written opinion and judgment in the case, which we adopt and quote approvingly, except as to his application of the law:
“Plaintiff alleges that he had been employed by Frank’s Rental Tools, which' operates casing crews, in a position classified as a pipe stabber; that as a result of a neck injury which he had received in an automobile accident on April 20, 1951, he is unable to do the particular work of a pipe stabber, which work, according to his allegations, consists of ‘installing casings in holes and of climbing rigs and operating vehicles.’ Plaintiff now seeks to recover total and permanent disability benefits under the Workmen’s Compensation law. LSA-R.S. 23-1021 et seq.
“Prior to his injury, on April 20, 1951, the plaintiff had worked for some three years with casing crew, and he testified that he did not classify himself as a qualified stabber until about a month and a half before his accident. During all of his employment prior to his injury he worked as a member of casing crews in every capacity.
“Mr. Beleau, manager of the defendant’s office (Frank’s Rental Tools) at Lafayette, where plaintiff was employed, testified that all members of casing crews were known as ‘casers’ and were so employed, and that any member of the crew who desired and was not afraid to climb and was willing to work on suspended platforms on the derrick was allowed to do stabbing work; no employees were hired as ‘stabbers’, but the work of ‘stabbing’ is assigned to various members who are willing to do that work and receive extra pay.
“An analysis of the distribution of the work termed ‘stabbing’ shows that there is no classified employment under the contemplation of the Workmen’s Compensation Law. As stated by Mr. Beleau the work of stabbing is assigned to various members of the crew who are qualified to do the work and not afraid to work on the platform. The work is distributed so that the qualified members of the casing crews may enjoy the benefit of the extra pay which accompanies this particular work. All casers by the job receive substantial wages. On jobs running for short (service) casings, the stabbers get $3 extra and on jobs for laying long strings of pipe, the casers get $5 extra. The work record shows that the plaintiff stabbed 16 times out of 61 jobs on which he worked from August 9, 1950 to April 20, 1951, and during that time seven different members of the casing crews acted as stabbers on jobs in which the plaintiff was a member of the casing crew. In this connection, Beleau further testified as follows:
“ ‘Q. Do you employ any one with a classification as stabber? A. No, sir.
“ ‘Q. How are the stabbers selected —is it in the office before they leave or at the well? A. We usually know whether they are stabbers or not. Most of them have had roughneck experience.
“ ‘Q. And various members of the crew are assigned on different jobs? A. Yes, sir; they do that among themselves a lot of times. In other words, in one crew there may be three or four men in one crew that can stab, or the pusher in that crew might ask any one of them if he wants to stab that particular job.’
“Dronet testified that his occupation was that of an oil field worker and under examination he stated:
“ ‘Q. Do you know any other trade but the oil field trade? A. No, sir, really don’t; that is my occupation.’
“The plaintiff was discharged by the doctors and returned to work with the defendant on September 12, 1951. He continued to work for the defendant from September 12, 1951 to October 23, 1951 as a member of a casing crew and participated in 17 jobs serving as stabber 6 times, and discharging other platform work on the other jobs. On October 23, 1951 he sustained a very'serious fracture of the arm which affected the wrist and was unable to work until February of 1952. Workmen’s Compensation benefits were paid and a compromise settlement for the arm injury was had. In February, *117 1952, the plaintiff returned to work with the defendant performing the various duties of platform workers which he describes ‘such as making up tubing with chain tong and breaking them loose with chain tong.’ He worked the floor until sometime in August, 1952, performed his work satisfactorily and without complaint of pain either to his fellow workers or his superiors. Sometime later during the month of August he was laid off by the defendant, Frank’s Rental Tools, ‘for talking too much.’ He had been working for the defendant for approximately 6 months after he had been discharged by the physicians in February of 1952.
“He then was employed by Baker Little-field working on the platform, of a drilling rig, and doing general oil field work. He also worked for a short time in September for Southern Production on the floor of a drilling rig, and then from October 8, 1952 to November 29, 1952 he was employed by Lindsey Drilling Company and there served as a derrick man. His work for these various employers was at all times regular and satisfactory.
“The plaintiff’s home burned and he voluntarily left his employment with Lindsey Drilling Company and began rebuilding his home which he was doing at the time of the trial.
“This suit is for the accident which occurred on April 20, 1951, and, outside of' the period of time he was off work on account of the arm injury he had worked satisfactorily and regularly until he had left the employ of Lindsey Drilling Company on November 29, 1952.
“The plaintiff contends that as a result of the neck injuries there is a restriction of movement of the head and the neck which impairs his efficiency, physical coordination and general physical ability to perform work of a similar character which he. had been engaged in.
“There is a great similarity in the work of a stabber and a derrick man with casing crews. There is some evidence that the work of a derrick man is more strenuous than the work of a-stabber. Mr. Wallace, one of the witnesses, testified that he thought that the man up on the platform had the easiest work. This is corroborated by the plaintiff at the time he applied with the Lindsey Drilling Company for work, whom he had told that he could not do any heavy lifting, and for that reason he was assigned the job of a derrick man who is commonly called a stabber.
“The plaintiff was never refused employment on account of his alleged disability and he never quit employment because he could not do the same type of work he had been doing prior to the neck injury. After September, 1951, the plaintiff did not seek further treatment for the neck injury and never complained to his superiors or fellow workers that he was suffering from pain as a result of the neck injury.
“Plaintiff was examined by Dr. James Gilly, Orthopedic Specialist of Lafayette, and was treated by him from the time of the injury to the time that he was discharged by the doctor. Dr. Gilly testified that the ■residual effects of the injury sustained in the automobile accident on April 20, 1951 were the following: The second and third cervical vertebrae became fused with V 2 being tilted forward on V 3; that there was some spur at the lower part of the cervical V 3 which did not affect the movement between V 3 and V 4; that there was no injury or resultant impediment between the skull and V 1 and V 2; that as a result of his condition he has a loss of flexion of approximately 10 per cent, and practically no loss of extension. The loss of rotation to the right side is approximately 20 per cent; that there were no muscle spasm nor any positive neurological findings; the arms and shoulders were in good condition when he discharged the plaintiff in September of 1951. Dr. Gilly’s opinion is that this slight ■restriction of motion did not constitute a disability to efficiently perform the work that- he was doing prior to the accident, including the duties of a stabber. Dr. Gilly further stated that the slight loss of motion in the area of the neck is compensated by the remaining portions of the entire body, so that after a period of readjustment, this *118 limitation of motion constitutes no disability.
“Dr. George Burkett, an Orthopedic Specialist of New Orleans, examined the plaintiff in October of 1951, after he had resumed his employment with the defendant company. From his clinical examination and the X-rays taken from various angles, Dr. Burkett testifies that there was no appreciable limitation of forward or backward bending of the head, with only slight limitation of -rotation of neck from side to side; and that there was a full range of motion of the arms and shoulders and the remainder of the body, except for the fusion between cervical V 2 and V 3, resulting from the accident. Dr. Burkett further stated that the forward and backward bending of the head occurs almost entirely between the skull and the first vertebra, and there was no mechanical block or damage of any kind in the area; that the rotation from side to side occurs approximately 50 per cent between cervical 1 and cervical 2, the remaining motion being distributed between the seven other cervical vertebrae, so that the fusion between the second and third should not restrict head and neck movement beyond approximately l/14th of its normal range. Dr. Burkett further explains how the unaffected cervical vertebrae, the-lumbar and dorsal vertebrae, and the lower extremities participate in the rotation of the moving man, and that the condition of the cervical vertebrae resulting from the automobile accident did not constitute any disability in performing his duties as an oil field worker.
“Dr. Blaise Salatich, also an Orthopedic Specialist in New Orleans, testified on behalf of the plaintiff. Dr. Salatich examined the plaintiff in October, 1951, and pronounced him totally and permanently disabled from carrying on oil field work.
“It is significant that this examination was made at a time when the plaintiff was performing the full duties of caser and stabber for the defendant company. Dr. Sala-tich’s testimony was taken in November of 1952 and he had not seen Dronet since the examination of October of 1951. With reference to the plaintiff’s inability to lift heavy objects, Dr. Salatich stated: ‘It is the loss of rotary movement of his head and neck and shoulder girdles that is the disabling feature in this case; not the loss of this man’s ruggedness. I would say that this man from the neck down is considered to be fairly rugged; but from the neck up, he is considered a cripple.’
“Dr. J. J. Burdin, an Eye, Ear and Nose Specialist of Lafayette, testified as to the plaintiff’s alleged loss of hearing as a result of the injury which he received on April 20, 1951. The plaintiff was referred to Dr. Burdin by Drs. Gilly and Breaux of the City of Lafayette, and his examination consisted of a complete eye, ear, nose and throat examination, including audiogram and tuning fork tests. The first examination disclosed that his ear drums were slightly retracted, otherwise were normal. His throat was negative; his nose showed a slight engorged mucosa, and the eustachi-an tubes were patent. The eyes were normal and the audiogram showed from 50 to 60 decibel hearing loss in the higher frequency wave lengths of the spoken voice range in both ears. Dr. Burdin was under the impression that because of the retraction of the ear drums the patient might have some eustachian obstructions. Treatment was given and the audiograms repeated, however, there was no difference in the findings. The loss of hearing remained constant and didn’t improve. When asked what the possible relationship between the accident of April 20, 1951 and 'the loss of hearing was, his answer was that he didn’t think there was any, and that any connection between the two might be possible but improbable. The loss of hearing was uniform in both ears and the trauma which the plaintiff received about the neck would not result in the uniform loss of hearing.
“In view of the testimony of Dr. Burdin,, the plaintiff has not satisfactorily proved that the loss of hearing as alleged in the petition was a result of the accident of April 20, 1951.
“It is evident that since the plaintiff was-discharged by Dr. Gilly in September of *119 1951, be has been continuously doing general oil field work on the floor and on the upper platforms, both as stabber and as derrick man, with the exception of the period of time he was off work on account of the arm injury. Further, the record discloses that the plaintiff was never refused employment on account of the alleged disability. He never complained of any pain or suffering either to his superiors or to his fellow workers, and insofar as the record is concerned, no complaint was made to his wife or any of his neighbors. No medical testimony or other evidence of any examination made by any doctor after October, 1951, when Dr. Salatich made his examination, was introduced by the plaintiff.
“In all the cases relied upon by the plaintiff there were distinguishing features ’ of complaints of pain and suffering and inability to perform the duties encumbent upon the employee in a satisfactory and efficient manner. In each of the cases the courts found that the employee was totally and permanently disabled where the evidence showed that the plaintiff was never free from pain and his efforts to work were attended by suffering, discomfort and inconvenience.
“In view of the medical testimony and the lack of lay testimony as to pain, suffering and discomfort, he has not discharged the burden imposed upon him by proving with satisfactory evidence that the injury, if any, prevents him from performing work of the same or similar description, kind or character he was performing before the injury. He is not only able, but has performed substantially all of the duties required of him as a member of a casing crew. Therefore, his claim for compensation will be denied.”
We agree with the Trial Judge on his findings of fact under the evidence that the plaintiff is able to do and perform the same kind and character of work he was performing at the time of the alleged accident and is not permanently and totally disabled to perform work of a reasonable character. However, we do not agree with the judgment of the District Court in denying plaintiff compensation for the permanent impairment of his neck, which was suffered by him during the course of his employment and for which the plaintiff received compensation at the rate of $30 per week for a period of 20 weeks, or total compensation in the sum of $600. The District Court made no award for permanent impairment of function of plaintiff’s neck. It may be that the plaintiff did not insist on it below. He has called it to our attention here, in brief.
The record in the case conclusively shows that the fusion of the fractured cervical vertebra has diminished plaintiff’s ability to rotate his neck. The forward movement or flexion has been impaired to ten degrees, and the lateral movement to the right is ten degrees, and the lateral movement to the left is twenty degrees. All of the doctors agree that this residual disability is permanent. The injury suffered by plaintiff to his neck is not to the extent to award him compensation under subparagraphs (1, 2 or 3) of LSA-R.S. 23 :- 1221, and his injury and disability is not provided for in subdivision 4, except under subparagraph (p), which reads:
“In cases not falling within any of the provisions already made, where the employee is seriously permanently disfigured about the- face or head, or where the usefulness of a physical function is seriously permanently impaired, the court may allow such compensation as is reasonable and as in proportion to the compensation herein-above specifically provided in the cases of specific disability, not to exceed sixty-five per centum of wages during one hundred weeks.”
We have examined the cases where compensation has been awarded under this provision. Most of the adjudications have been for injuries covering disfigurement about the face or head or for the loss of teeth. Under this provision of the statute, the court fixes the amount of the compensation to be allowed, as is reasonable, and as in proportion to the compensation specifically provided for in the cases of specific disability, and the statute specifically provided that it shall not exceed 65% of wages *120 during 100 weeks. In order to determine a proper award in this case, we have reviewed the following cases: Odom v. Atlantic Oil Producing Co., 162 La. 556, 110 So. 754; Wallace v. Natural Gas & Fuel Corp., 8 La. App. 614; McBride v. Natural Gas & Fuel Corp., 9 La.App. 513, 119 So. 722; Smith v. L. H. Gilmer Co. of Louisiana, 11 La.App. 336, 123 So. 451; Sadler v. May Bros., Inc., La.App., 185 So. 81; Goins v. Shreveport Yellow Cabs, La.App., 200 So. 481; Macaluso v. Schill-Wolfson, Inc., La.App., 56 So.2d 429.
The plaintiff having suffered an injury which is covered by a section of the statute that is not strictly compensatory and which does not, according to the evidence, affect his ability to work or his earning capacity, the period of time he was totally disabled, as well as the nature and character of the injury suffered causing the permanent impairment of the function of his neck should be considered in making any award of compensation under this provision. The plaintiff was placed in a head halter traction for a period of seven days, and for a thirty day period following, a plaster of paris cast was applied from the crown of his head to the level of his hips, with his face and ears cut out. This was removed about forty days after the accident, and after its removal, a Thomas collar ' was applied. The plaintiff was discharged on September 5, 1951, after having been under the treatment of the attending physician for a period of approximately four and a half months.
Exercising the discretion which we are permitted to do under the quoted provision of the statute, and after due consideration of awards made by the other appellate courts of this state, under this provision of the statute, we believe that the plaintiff is entitled to recover compensation at the rate of $15.00 per week for a period not exceeding 100 weeks on account of the serious and permanent impairment of the function of his neck. The 20 weeks’ compensation at $30.00 per week paid, to him by the defendant will be deducted from this award.
Where compensation has been paid under subdivisions (1), (2), or (3), of LSA-R.S. 23:1221, the amount of such payment shall be deducted from any compensation allowed under subdivision (4) thereof or under Subpart C of this Part.” LSA-R.S. 23:1223. ’
For the reasons assigned, the judgment appealed from is voided and reversed, and it is now ordered, adjudged and decreed that the plaintiff, Paul Dronet, do have and recover judgment against the defendant',. American Mutual Liability Insurance Company, for weekly compensation at the rate of $15 per week for a period not exceeding-100 weeks, subject to the payment of 20-weeks’ compensation at $30 per week up to September 6, 1951, together with 5% per annum interest on all past due installments of compensation from their respective due dates until paid; and that the defendant pay all costs.