REID, Judge.
This is a suit for workmen’s compensa\tion brought by Jessie Golden against his •employer Starns-McConnell Lumber Corporation as the result of an alleged accident which happened on October 3, 1960. Plaintiff was employed as a laborer, and on the day of the alleged accident plaintiff was aiding in the loading of logs when a log • chain which was under tension broke and struck him in the face. In his pleadings plaintiff alleged that he was totally and permanently disabled because of an injury to his face and to his left knee, which injury occurred when he fell as a result of the 'blow on his face. Pie asked for workmen’s -compensation from date until paid, for a period of 400 weeks, at the rate of $35.00 per week with legal interest on each week’s -compensation from date until paid, less compensation already paid, and for medical and hospital expenses. In addition plaintiff asked for attorney’s fees and penalties. At the trial of the case the plaintiff plead orally and alternatively that he has an impairment of physical function as a result of some of this teeth being knocked out which would necessitate the rest of them being pulled, all resulting from this accident.
It was stipulated between the parties that on October 3, 1960 the accident involved in this suit did occur; that there was an injury to the face; and that compensation was paid from October 10, 1960 until June 24, 1961, or a total of 38 weeks, in the amount of $1330.00 (65% of weekly wages of $54.00, or $35.00 per week). It was further stipulated that medical expenses in the amount of $579.05 had been paid.
Defendant denied plaintiff was disabled in any manner after the termination of compensation payments on June 24, 1961, and further denied the impairment of physical function could be urged in this case because the statutory provision allowing compensation benefits for the impairment of a physical function clearly states that it only arises when none of the other statutory benefits are applicable. The defendant conceded plaintiff was partially disabled in the first place, for which disability he received compensation, but urged that he could not recover double under the compensation act even in the event the Court could find as a matter of fact that he did have an impairment of a physical function. Of course, defendant denies that there was any impairment of a physical function.
On these issues the case was tried on November 20, 1961, and for written reasons assigned April 11, 1964, judgment was rendered and signed May 26, 1964. The Trial Judge rejected the claim of plaintiff for total and permanent disability resulting from injury to his knee and rendered judg *80 ment in favor of plaintiff and against defendant for workmen’s compensation benefits of $35.00 per week for 50 weeks or the sum of $1750.00 for the impairment of a physical function for loss of teeth under the provisions of LSA-R.S. 23 :1221(4) (p), plus the additional sum of $260.00 for medical expenses incurred by plaintiff in treatment by Dr. Wylie C. Barrow, together with legal interest from date of judicial demand until paid, and fixed medical expert fees of Drs. James F. Halley, Gerald Joseph, Edmond Faulkenberry, Wylie C. Barrow, Collins P. Lipscomb, William E. Smith, and James L. Coffee at $50.00 each to be taxed as cost. He ordered all costs to be paid by the defendant with the exception of the fees of Drs. Halley, Smith, Lipscomb and Faulkenberry, to be paid by plaintiff. From this judgment, both the plaintiff and defendant have entered appeals.
On this appeal plaintiff alleges the Trial Court was in error (1) in refusing to hold that the plaintiff was totally and permanently disabled as a result of the injury to his knee, (2) in refusing to assess penalties and attorney’s fees against defendant, and (3) in assessing expert witnesses fees, and alternatively that plaintiff should have received $35.00 per week for 100 weeks rather than $35.00 for 50 weeks.
Defendant alleges the Trial Court erred in using the term that plaintiff was entitled to compensation “for the impairment of a physical function” rather than “the usefulness of a physical function is seriously permanently impaired.” In the alternative defendant urges the Trial Court’s judgment was excessive.
With regard to the claim of plaintiff for compensation for total and permanent injury to his knee, the Trial Court held the plaintiff did not show any connection between the ailment of his knee and the accident.
The record discloses that on the afternoon of the accident plaintiff was working in a swampy area in the woods in water approximately at the level of his hips. Plaintiff testified that at the time of the accident he was standing clear of the log when something hit him. He stated he could not tell exactly what had happened but that the day after he was admitted to the hospital his knee was hurting. Fie admitted he did not tell any of the doctors or nurses or anyone working in the hospital about his knee but his testimony is most contradictory as to whether or not he told his wife and his son about his knee. He first said the only person he told while in the hospital was his cousin Reesa (who was not called as a witness) then he said he believed he told his wife and may have told his son, and then later said he told his cousin, his wife and his son that his knee was hurting while in the hospital. Plaintiff testified he went to see Dr. Thames of Hammond about his leg, but a stipulation entered into between counsel indicates that if Dr. Thames were present he would testify he had not treated plaintiff on October 3, 1960, or at any time subsequent thereto. The record shows plaintiff was treated by Dr. Collins P. Lipscomb of Ponchatoula at the time of the accident. Dr. Lipscomb stated that although he had only made a cursory examination, to the best of his knowledge the plaintiff made no complaint at that time about his leg but only complained of the injury to his face. This is further borne out by the medical report Dr. Lipscomb made in connection with the accident. Dr. Lipscomb further testified, however, that some time after plaintiff’s discharge from the hospital he came to Dr. Lipscomb’s office and complained of his knee and was instructed to go to Dr. Edmond Faulken-berry, the local doctor for his employer. Dr. Lipscomb further testified he had treated plaintiff sometime during August of 1961 but the treatment was unrelated to the accident and at that time plaintiff had not complained of his knee.
Dr. Faulkenberry testified that according to his office records the plaintiff came to his office on January 3, and January 7, 1961 complaining of pain in his left knee, right elbow and right hand, and he gave plaintiff *81 medicine for arthritis but he had no independent recollection of the visit. This apparently was the first doctor to whom plaintiff complained about his knee.
Dr. Gerald Joseph, who performed an operation on plaintiff’s face, testified he first saw plaintiff on October 3, 1960, the date of the accident, and stated that his examination of the plaintiff had been limited to the head and face. When he was asked by counsel if plaintiff complained of a knee injury he said his records indicated that when he saw plaintiff on December 8 (two months after the accident) plaintiff was complaining of knee trouble and pain in his left shoulder, but that he had no independent recollection of the complaint.
Plaintiff was also examined by two orthopedic specialist, Dr. William E. Smith, and Dr. James F. Halley, of Baton Rouge. Dr. Smith examined plaintiff on June 6, 1961, approximately 8 months after the accident. In his report to plaintiff’s counsel, dated June 20, 1961, he said:
“It is my impression following examination of this individual that he has an internal derangement of the left knee, most probably in the form of a torn medial meniscus. He also has synostosis of the proximal tibia and fibula which could be explained on the basis of old trauma or it is possibly congenital.”
Dr. Smith admitted, however, that the internal derangement he found in the left knee could have been caused by osteo-chondritis dissecans and that he found no objective evidence of trauma to the knee.
Plaintiff was examined by Dr. Halley on November 13, 1961, over a year after the accident. He testified that x-rays were taken on both knees (which was not done by Dr. Smith) and that these pictures showed evidence of acute boney injuries such as fractures, dislocations, or other acute boney abnormalities, and that incidental findings were noted of osteochondritis dissecans of the medial condyle of the femur. He further stated this could be caused by either degenerative change or trauma but since both of plaintiff’s knees showed the same condition he felt plaintiff’s condition was the result of a degenerate change. He stated he did not find any condition in the left knee which did not exist in the right knee, other than the suggestion of pain.
Plaintiff testified that three men were working with him, namely Earl Austin, Charlie Mitchell and Pat Fields.
Earl Austin testified when plaintiff fell his leg was jammed against a stump in a hole in water. He had seen plaintiff once in the hospital and once after he got home, at which latter time plaintiff’s leg was swollen. On cross examination, however, Earl Austin, who had a 12th grade education, admitted he had given a statement on August 11, 1961, to Robert Hatcher, an insurance adjuster, which contained the following language:
“The only thing I saw injured on Jessie Golden was his face and as far as I know his face was the only thing injured.”
But he denied making the following statements which were contained in the written statement:
“Jessie stayed in the hospital for a good while and I did not see him again until he got out of the hospital.”
“About four days after he got home, Jessie Golden asked me if I knew whether he fell on anything that could have hurt his leg. He said that his leg had been hurting him since the accident. I told him that I didn’t know whether he fell on anything or not because I couldn’t see under the water.”
Austin admitted he signed a statement and admitted that he wrote “yes” to the questions “Have you read the above 1J4 pages? Are they true and correct to the best of your knowledge?” The depositions of Robert A. Platcher taken subsequent to the trial and the mentioned statement were in *82 -troduced in the record. In the depositions Robert Hatcher identified the statement and ■stated Austin had made the statements set -forth above, which Austin had denied at The time of the trial. In commenting upon This phase of the case the Trial Judge said •in his written reasons for judgment:
“However, Earl Austin, plaintiff’s witness above referred to, gave a written report to Mr. Robert A. Hatcher, an adjuster, and in said report stated •that the only thing he saw injured on Jesse Golden was his face. However, • on the date of the trial his testimony -was different from his written report, .and he testified on the trial that the -plaintiff was injured in the left knee.”
“This witness had a 12th grade high -school education and he signed the written report and therefore, the court under such circumstances cannot give any credence to his testimony.”
The other witnesses to the accident, Pat IFields (who apparently goes by the name Tat Fields although he stated his name was .¡Frank Williams) and Charlie Mitchell both •stated they had no knowledge as to whether -or not plaintiff had injured his knee. Pat Fields stated that as far as he knew the only -thing plaintiff injured was his face.
Both plaintiff’s wife and his son testified •in great detail about the injury to his knee .-.and that they knew of this injury while -plaintiff was in the hospital. However, -plaintiff’s wife testified that she had not ••discussed her husband’s knee injury with .any of her husband’s doctors or nurses while 'he was in the hospital.
On the basis of all the evidence, including ~the medical evidence, the Trial Judge con••cluded the plaintiff had failed to show a connection between any ailment of his knee and -this accident. Our examination of the testimony and of the medical findings in this ■record does not show that this finding by -the Trial Judge is in error.
Plaintiff argues that it makes no •difference whether or not the alleged injury to the knee is of a torn medial meniscus, or is osteochondritis dissecans for if it was a torn medial meniscus there was no doubt it was caused by trauma, and if osteochon-dritis dissecans no doubt it could be caused or aggravated by trauma. While this may be true from a medical standpoint, it is certainly important in attempting to find out by the use of medical findings whether or not an injury actually occurred when it does not appear from the balance of the record that an accident had actually occurred. It is the opinion of this Court that the conflicting medical views of the two orthopedists do not throw any light on whether or not the injury alleged actually occurred as a result of the accident, and, therefore, the holding of the Trial Court was purely a holding of fact which cannot, from the record, be held erroneous.
As already noted, counsel for plaintiff urges that the Trial Court erred as a matter of law in applying LSA-R.S. 23:1221(4) (p) to the case at issue and alternatively the Trial Court erred as a matter of law in finding impairment of a physical function rather than the usefulness of a physical function is seriously and permanently impaired. LSA-R.S. 23:1221 is that provision of the Louisiana Workmen’s Compensation Law which provides for disability benefits payable under the law. Subsection (1) deals with injuries producing temporary total disability to do work of any reasonable character, subsection (2) deals with injuries producing permanent total disability, subsection (3) deals with injuries producing partial disability, and subsection (4) provides the schedule for injuries, setting forth the benefits to be paid an employee for the loss of certain specific parts of the body. Subsection 4(p), the portion at issue herein, deals with disfigurement and impairment of a physical function and reads as follows:
“In cases not falling within any of the provisions already made, where the employee is seriously permanently disfigured about the face or head, or where the usefulness of a physical function is seriously permanently impaired, the *83 court may allow such compensation as is reasonable and as in proportion to the compensation hereinabove specifically provided in the cases of specific disability, not to exceed sixty-five per centum of wages during one hundred weeks.”
It should be noted that the first portion of the above quoted section reads “[i]n cases not falling within any of the provisions already made” and plaintiff argued that this limits the application of this provision of the Workmen’s Compensation Law to situations not covered by any other provisions set forth in LSA-R.S. 23:1221, that is, this provision does not apply when there has been an accompanying disability, citing among other authorities” : Malone, Louisiana Workmen’s Compensation Law and Practice, Sec. 284, Page 364. See also Mack v. Legeai, 144 La. 1017, 1018, 81 So. 694 (1919); Garr v. Wyatt Lumber Co., 147 La. 689, 690, 85 So. 640 (1920); Bergeron v. New Amsterdam Casualty Co., 243 La. 108, 141 So.2d 832 (1962).
As it has been stipulated by counsel for both parties that plaintiff received workmen’s compensation benefits of $35.00 per week from October 10, 1960 to June 24, 1961 totaling $1330.00 and medical expenses' of $579.05 and as defendant admitted that plaintiff was unable to do work of a reasonable character during that period because of injury to plaintiff’s face, defendant urges that it would, therefore, follow that this case falls within that portion of LSA-R.S. 23:1221(4) (p) which reads “provisions already made”, and as the plaintiff had been paid compensation for disability the Trial Court erred in awarding additional compensation benefits under that provision. Plaintiff did not meet this issue head-on, merely citing two cases as standing for the proposition that the mere loss of teeth would entitle plaintiff to 65% of $54.00 or $35.00 per week for 100 weeks at least. The cases cited are Macaluso v. Schill-Wolfson, Inc., La.App., 56 So.2d 429 and Fruge v. Hub City Iron Works, Inc., La.App., 131 So.2d 593.
The Trial Judge’s award insofar as allows plaintiff $35.00 per week for 50 weeks is incorrect. It is well settled that in cases involving the application of LSA-R.S. 23 :- 1221 (4) (p) the Court must award compensation for a period of 100 weeks but is allowed discretion in the amount of such compensation. Fruge v. Hub City Iron Works, Inc., supra; Odom v. Atlantic Oil Producing Co., 162 La. 556, 110 So. 754; Goins v. Shreveport Yellow Cabs, Inc., La. App., 200 So. 481.
Counsel for defendant has written an exhaustive brief and has cited many cases in support of his position. However, this Court does not feel the same is in line with the jurisprudence. There are many cases in which, under Section 1221(4) (p), recovery has been allowed although payments have been made for disability.
In the case of Dronet v. American Mutual Liability Insurance Company, La. App., 69 So.2d 114, plaintiff was awarded weekly compensation at a rate of $15.00 per week for a period not exceeding 100 weeks on account of the serious and permanent impairment of the function of his neck, subject to a credit of 20 weeks compensation at $30.00 per week previously paid him.
Francois v. Circle Drilling Company, La. App., 112 So.2d 771, awarded $35.00 for 100 weeks, less credit of five weeks compensation paid
Thornton v. Haynesville Lumber Co., La. App., 155 So. 784, awarded $3.00 per week for 100 weeks, less credit for compensation paid for six weeks and four days.
Kennedy v. Bayou Rapides Lumber Company, La.App., 25 So.2d 16, affirmed judgment for compensation for eight weeks and amended the judgment by awarding plaintiff 100 weeks at $650.00, without making any credit for compensation paid.
Section 23:1221 must be read in connection with 23:1223 which reads as follows:
“Where compensation has been paid under subdivisions (1), (2), or (3), of *84 R.S. 23:1221, the amount of such payment shall be deducted from any compensation allowed under subdivision (4) thereof or under Sub-part C of this Part.”
The principles here are well stated in Fruge, supra, wherein Judge Tate, speaking as the organ of the Court, stated as follows :
“ * * * Although compensation paid for disability should be deducted from the payment of benefits for impairment or disfigurement (LSA-R.S. 12:1223; Francois v. Circle Drilling Company, La.App. 1 Cir., 112 So.2d 771), nevertheless the liability for payment of compensation for disfigurement or impairment is independent of and in addition to any liability for temporary disability arising out of the same accident (see Francois case, above-cited; Kennedy v. Bayou Rapides Lbr. Co., La. App. 2 Cir., 25 So.2d 16; * * *).”
We cite this, being well aware that in that case credit for earned wages was at issue rather than compensation.
It is, therefore, the opinion of this Court that the Trial Judge was correct in his application of LSA-R.S. 12:1221.
We believe defendant’s second allegation of error attacking the Trial Judge’s award for the plaintiff “for the impairment of a physical function” is merely a matter of semantics. The Trial Judge stated in his reasons for judgment:
“The evidence clearly shows that the plaintiff did suffer facial injuries in said accident and that he did lose some of his teeth which caused a certain impairment of a physical function due to the loss of said teeth. However, there is testimony to the effect that at the time of the accident the condition of the teeth were such that they were of no use to the plaintiff. However, we think that the plaintiff should be awarded compensation for the loss of said teeth for a period of fifty weeks at the sum of $35.00 per week or the sum of $1750.00.”
Defendant argues the Trial Court’s finding that the accident caused plaintiff a certain “impairment of a physical function” for the loss of teeth is not in accord with the language used in LSA-R.S. 23:1221 (4) (p) which provides for benefits where “the usefulness of a physical function is seriously permanently impaired.” It seems clear to us, however, that the Trial Judge’s opinion is based upon the statute. As a matter of fact the judgment itself states the finding is based upon “the provisions of LSA-R.S. 23:1221(4) (p).
We now take up the question as to wheth-: er or not the record supports the Judge’s finding in this regard.
Dr. James L. Coffee, an expert in the field of oral surgery, testified when he first saw the plaintiff “he had received a blow to the left upper jaw which had fractured six teeth. Those teeth were the upper left central and lateral incisors, the cuspid, the second bicuspid and two molars. The process — the alveolar process which those teeth are set in was fractured. And the oral mucous membrance and gum tissue in that area was quite lacerated.” There was no conclusive evidence by Dr. Coffee concerning any impairment of physical function, although he did testify that no' one could tell whether the removal of bone would create any problem until the missing teeth were replaced.
Dr. Wylie Clark Barrow, a dentist of Baton Rouge, Louisiana, testified when he first examined the plaintiff “he had missing teeth, and the teeth that were left were of no value to him, and we decided to pull the remaining teeth and replace them with a plate.” He estimated at the time he examined the plaintiff he had about eight or nine teeth left and his jaw was out of alignment. He stated the eight or nine teeth he had left would not perform the regular duties of chewing food and mastica- *85 When asked the hypothetical question. tion:
“Q: Assume that this man had five teeth missing in the left upper part of his mouth, and assume that he had all of his bottom right teeth missing, so that five teeth on the upper left and all of his bottom right teeth were missing, in your opinion would that man have a normal function of mastication ?”
He answered: “No.”
He was further asked:
“Q : Dr. Barrow, assuming that a man has teeth which can perform the job of chewing adequately, then he has an accident and knocks out more teeth, and following this accident he can’t chew his food adequately, would you say that the inability to chew the food was a result of the accident?
“A: Well, if it knocked more teeth out it must be.”
Dr. Barrow did not know what teeth the plaintiff had prior to the accident but at the time of the trial he knew the plaintiff did not have sufficient teeth to perform the job of chewing; although he admitted the patient should have returned for further treatment but had declined to do so. It is ■apparent, however, that the Trial Judge felt from all of the evidence that prior to the .accident the plaintiff had no impairment of a physical function and that after the accident a physical function was seriously permanently impaired. Here again we are dealing with a finding of fact by the Trial Judge and it does not appear from the record that the Trial Judge committed a ■reversible error.
It is our opinion the finding of the Trial Judge is in line with the finding of the Court in Fruge, supra, wherein the Court held as follows:
“Although the defendant contends that the employee is not entitled to compensation for the additional serious impairment of physical function sustained by the plaintiff because the rest of his upper teeth were removed as well at those injured in the accident, we regard such an argument to have been substantially answered in Macaluso v. Schill-Wolfson, Inc., La.App., 56 So. 2d 429, by our brethren of the Orleans Court when it awarded maximum compensation where dentures had been supplied to replace not only some sixteen teeth broken in the accident but most of the other teeth which had been lost previously. There, it was stated, 56 So. 2d 431-432:
“ ‘ * * * consequently, since prior to the accident plaintiff had sufficient teeth to permit him to perform all of the usual functions of teeth[1] it is proper to hold that his present condition is chargeable to the accident.
“ ‘The situation is much the same as that which is found where an employee, prior to an accident, suffers from some latent disease or minor physical disability but is able to perform all that is required of him and, as a result of an accident, the condition is so aggravated that the employee is unable to continue to do the same work. In such case compensation is awarded because of the fact that the accident brought to light a condition which, except for the accident, might never have come to light and which possibly might never have affected the ability of the injured party to perform all of his usual physical functions.’ ”
*86 “Further, when the medical treatment for the accidental injuries is caused in fact of the final condition of the employee, such residual is in itself considered a result of the accident and therefore compensable * *
It is well established that an award of 65% for 100 weeks for the impairment of a physical function due to the loss of teeth is in line with the jurisprudence, Fruge v. Hub City Iron Works, Inc., La. App., 131 So.2d 593; Macaluso v. Schill-Wolfson, Inc., La.App., 56 So.2d 492; Daigle v. Blasingame, La.App., 162 So.2d 351.
With regard to plaintiff’s claim for penalties and attorney’s fees, we do not feel that the failure of the defendant to pay, or tender the amounts alleged to be due was arbitrary) or so unreasonable, as to justify an award in that regard.
The judgment of the District Court is, therefore, amended to award the full maximum amount permitted by the statute, that is, $35.00 per week for 100 weeks, subject to a credit for the 38 weeks compensation has been previously paid, and in all other respects the judgment of the Trial Court is affirmed.
Amended and affirmed.

. There is no evidence in this record to indicate that prior to the accident the condition of plaintiff’s teeth prevented Mm from performing all of the usual functions of teeth.