445 So.2d 499 (1984)
Charles EDWARDS, Plaintiff-Appellant,
v.
The HARTFORD INSURANCE COMPANY, Defendant-Appellee.
No. 15953-CA.
Court of Appeal of Louisiana, Second Circuit.
January 16, 1984.
*500 Cook, Yancey, King & Galloway by Charles G. Tutt, Shreveport, for defendant-appellee.
Ike F. Hawkins, Jr., Shreveport, for plaintiff-appellant.
Before JASPER E. JONES, FRED W. JONES, Jr., and SEXTON, JJ.
JASPER E. JONES, Judge.
A judgment was rendered awarding plaintiff, Charles Edwards, workers' compensation benefits for permanent scarring to his face and rejecting his claim for penalties and attorney's fees. Plaintiff appeals the judgment insofar as it rejects his demand for penalties and attorney's fees. The defendant, The Hartford Insurance Co., neither appealed the judgment nor answered plaintiff's appeal.
The plaintiff, while driving a truck for defendant's insured, was injured in an accident at approximately 3:00 p.m. on December 4, 1981 in Many, Louisiana. Plaintiff suffered extensive facial lacerations, among other injuries, in the accident. A doctor in Many referred plaintiff to Dr. Judd Chidlow, a plastic surgeon in Shreveport, for treatment of his facial injuries.
Plaintiff met Dr. Chidlow in the emergency room at Highland Hospital in Shreveport at approximately 5:30 p.m. the day of the accident. Dr. Chidlow described plaintiff as having one of the most extensive facial injuries he had ever treated. The lacerations required from 400 to 500 stitches. Dr. Chidlow gave the following description of plaintiff's injuries in response to questions from plaintiff's attorney in a deposition taken October 25, 1982.
Q. Could you describe the lacerations and the extent of the lacerations to his face, particularly?
A. Yes, sir, primary ones he had, about a two centimeter vertical laceration through his lower lip. He had a five centimeter laceration of the upper lip starting just at the base of the columella *501 of the nose going all the way down to the maxilla and going out into the left cheek. The whole thing was approximately seven centimeters in diameter. The commissure of the left side of his mouth was completely torn out. He had an avulsion of two centimeters defect just below and lateral left lower eyelid, which had underminded down on his cheek. He had a four centimeter laceration of the center of his left cheek. He had about a three centimeter laceration of the left cheek below this. He had a stellate three centimeter laceration in his tongue, the left side of the tongue. His upper alveolar, or the upper bony ridge was lacerated, actually had a fracture of the bone above the right central incisor and lateral incisor and canine tooth. He had two small lacerations on the center of his upper lip. In addition, he had a ten centimeter laceration in the left neck and shoulder, and about a five centimeter laceration of his right forearm.
Q. Now I believe that you are reading from a report that you had worked up dated December 4th?
A. That is correct.
Q. Number three on that report says, the lacerations to the upper lip. Now they started at the base of the
A. This is the columella of the nose (indicating).
Q. That would be the mid-part of the underside of the nose?
A. Yes, sir, and it went up into the nose.
Q. And it ran from there to where?
A. Well, let me read that again to clarify it. Five centimeter laceration startinglaceration to the upper lip, starting just at the base of the columella of the nose, going all of the way down to the maxilla and the bone behind that and going out into the cheek on the left side. So it went out like so (indicating).
Q. Now # 4, the avulsion injury. What did that tear out?
A. Okay, that was an avulsion of about two centimeter defect below the left lateral eyelid, just a piece of tissue was actually just gone from there. We had to swing a flap to bring a piece back to prevent his eye from being pulled down. He actually lost a piece of tissue in that area.
Dr. Chidlow answered these questions by reading from a report that he made on the date of plaintiff's accident. There is no indication in the record that defendant ever received this report.
Plaintiff was off work for approximately 7 weeks after the accident. During that period of time defendant paid him weekly benefits totalling $1,333.28. Defendant also paid plaintiff's medical expenses. When plaintiff returned to work his weekly benefit payments were terminated and he secured the services of an attorney. The attorney made numerous demands on defendant to resume paying weekly benefits to plaintiff for the scars on his face. The defendant repeatedly refused and suit was filed July 9, 1982. On October 4, 1982 defendant tendered a $5,500.00 check to plaintiff which he apparently accepted.[1] The matter came to trial March 9, 1983.
By stipulation of the parties the only injury to plaintiff at issue in the trial was the facial scarring. At the close of the trial, the trial court awarded plaintiff $183.00 per week for 100 weeks, which is the maximum benefits that could have been awarded.[2] Since the amount of the award is not questioned by either party, this appeal is limited to the issue of whether the trial court properly rejected plaintiff's claim for penalties and attorney's fees.
The failure of a workers' compensation insurer to pay a claim due within 60 days after satisfactory proof of the injury *502 from the injured employee subjects the insurer to a statutory penalty of 12% interest and reasonable attorney's fees where the failure to pay is found to be arbitrary, capricious or without probable cause. La. R.S. 22:658.[3] See also R.S. 23:1201.2. The question of whether penalties and attorney's fees will be awarded for termination of benefit payments is subject to the same arbitrary and capricious standard. See Johnson v. State Farm Mut. Auto. Ins. Co., 342 So.2d 664 (La.1977); Johnson v. Continental Ins. Companies, 410 So.2d 1058 (La.1982).
Whether or not a termination of or refusal to pay benefits is arbitrary, capricious or without probable cause depends primarily on the facts known to the insurer at the time of its action. Lee v. Smith, 248 La. 16, 176 So.2d 413 (1965); Arthur v. McConnell, 286 So.2d 499 (La.App. 2d Cir. 1973); Hughes v. Webster Parish Police Jury, 414 So.2d 1353 (La.App. 2d Cir.1982); Scott v. Sears, Roebuck & Co., 406 So.2d 701 (La.App. 2d Cir.1981). The question is ultimately one of fact and the trial court's finding should not be disturbed on appeal absent manifest error. Scott v. Sears, Roebuck & Co., supra; Kilbourne v. Armstrong, 351 So.2d 802 (La.App. 1st Cir. 1977).
Defendant claims its termination of benefit payments was not arbitrary, capricious or without probable cause because the facts known by it at the time established legitimate questions as to whether any benefits were owed and if and when it became apparent that benefits were owed the amount of such benefits.[4]
An injured employee who sustains facial scars from a job related accident may recover compensation benefits under La.R.S. 23:1221(4)(p) which provides:
In cases not falling within any of the provisions already made, where the employee is seriously permanently disfigured about the face or head, or where the usefulness of a physical function is seriously permanently impaired, the court may allow such compensation as is reasonable and in proportion to the compensation hereinabove specifically provided in the cases of specific disability, not to exceed sixty-six and two-thirds per centum of wages during one hundred weeks. (emphasis added)
In cases involving facial scarring this provision requires that the scars be both materially disfiguring and permanent in nature. Templet v. Travelers Insurance Company, 278 So.2d 805 (La.App. 1st Cir.1973); Dykes v. North River Insurance *503 Company, 270 So.2d 329 (La.App. 1st Cir. 1972); Addison v. Neeb Kearney & Company, 252 So.2d 471 (La.App. 4th Cir.1971).
The defendant's adjuster, Chuck Mullis, testified that the only medical report which the defendant ever received as to the nature of plaintiff's facial scars was a report from Dr. Chidlow dated February 23, 1982 which it received on March 1, 1982. It stated:
"I have not seen Mr. Edwards since January 4, 1982. I do not suspect any permanent damage with the exception of scars on his face. As you noted, I did plastic surgery to repair these, but always it would be a possibility that some scar revision operations would be necessary depending on how much this bothers him. I do not think his dizziness will be permanent, and from my standpoint, he can go back to work at any time and could have at any time that his dizziness subsided to the point where he can drive his truck."[5] (emphasis added)
A review of the letter establishes only that the plaintiff would have some permanent scarring which would be subject to improvement by plastic surgery. The letter does not establish the nature or extent of the permanent scarring nor whether or not it would cause the plaintiff to be "seriously permanently disfigured about the face or head" in order for the scarring to be compensable within the contemplation of R.S. 23:1221(4)(p). When defendant received this letter it was placed under a duty to investigate plaintiff's claim by seeking further information from Dr. Chidlow. See Billiot v. Alton's Bakery of Morgan City, 398 So.2d 624 (La.App. 1st Cir.1981); Self v. Riverside Companies, Inc., 382 So.2d 1037 (La.App. 2d Cir.1980); Dowden v. Liberty Mut. Ins. Co., 346 So.2d 1311 (La.App. 3d Cir.1977); Zeringue v. Fireman's Fund American Insurance Co., 271 So.2d 613 (La.App. 1st Cir.1972); Barham v. Mathieu, 198 So.2d 145 (La.App. 1st Cir.1967).
Dr. Chidlow is the only doctor who ever examined, treated and evaluated plaintiff's facial injuries and he testified in a deposition taken on October 25, 1982 and introduced as evidence at trial on March 9, 1983 that he last examined plaintiff in January, 1982.[6]
In this deposition the plastic surgeon described the extensive facial injuries which the plaintiff received and his repair of these injuries. He stated:
Q. Would you expect any permanent scarring in a case like that?
A. You would have some scarring, but I surely worked hard to minimize it, in procedures like this, scars after a year of time, if they are of concern to a patient, they can be revised and proved (sic)." (emphasis added)
. . . . .
Q. Doctor, how successful were you putting Mr. Edwards back together?
A. I think it went very well. I think it certainly is functional now there are scars that one can see, but I really have not seen this gentlemen since January excuse me, I take that back, since I think it was approximately January of '82, but it was healing the way that I had hoped it would be healing it at that time.
. . . . .
Q. And when you say you had a good result, I presume you are considering the extent of this man's injuries?
A. Yes, I am, but also the scarring is, you know, you can look and see there. There is just not, it is just not at all, you know, hideous looking or anything like one might expect after looking at the pictures.
. . . . .
Q. Doctor, you mentioned that if you look close, you could see the scars, is that what you said?
A. Yes.

*504 Q. I was trying to listen.
A. Most of them are not real obvious. There are a few now certainly that you can see, but most of them end up, you know, they were improved. I have not seen this gentlemen in nine or ten months.
Q. After scars have formed, after this period of time, are they likely to change at all?
A. Sir, it takes approximately nine months to a year for a scar to mature. Now after a year, change would be very minimal, but it can certainly change. Most of the change takes place the first three months, but it definitely can change up to about a year ...
. . . . .
Q. Does he have scars?
A. Yes, he does have scars.
Q. And this is around the facial area?
A. Well, every area where the skin was broken, he would have a scar. Most of them are very small and I was pleased, quite pleased with the results that we were able to achieve, but there are scars.
Chidlow's deposition along with his February 28, 1982 letter establishes that he had not seen the plaintiff since one month following his facial injuries and the plastic surgery which was initially performed. At the time of this examination Dr. Chidlow stated that the surgery was very successful and most of the scars were not obvious though a few were plainly visible. He stated that you received substantial improvement in the scarring appearance during the first three months following the surgery and some improvement for a year following the surgery. He testified that the scars which remained could be further improved by later plastic surgery. He did not predict what scars would remain nor give any indication of their location or dimensions. He made no statements that the scars which would remain would seriously permanently disfigure the plaintiff about the face.
There is no evidence that the defendant sought further information from Dr. Chidlow following it's receipt of the February 24, 1982 letter but it is reasonable that the information and lack of it contained in Chidlow's October 1982 deposition is what defendant would have obtained on further inquiry.
From the information in defendant's possession and that which would have been available upon further inquiry from Dr. Chidlow the trial court could have found there was a substantial question as to what additional benefits, if any, were owed to the plaintiff at the time plaintiff's compensation was terminated.
The record does establish that the defendant received a copy of a picture of plaintiff taken by Dr. Chidlow at the time of his examination and surgery which reflected the extent of plaintiff's facial injuries. There is evidence that the defendant adjuster requested permission to view plaintiff's face and received this permission. We assume this interview occurred although there is no positive evidence of its occurrence in the record. There is no indication as to when the defendant received the picture and had the interview with the plaintiff.
On October 4, 1981, ten months following plaintiff's facial injury the defendant paid him $5,500 which would equal 100 weeks of weekly benefit at the minimum rate.
At the trial of the case on March 9, 1983 there was no medical testimony presented as to the nature and extent of the plaintiff's permanent scarring other than the deposition taken from Dr. Chidlow who had last seen the plaintiff in January, 1982. Attached to this deposition were four pictures taken by Dr. Chidlow on December 4, 1981 before and after the plastic surgery was performed which reflected the serious facial injuries sustained by the plaintiff. There were no pictures of the plaintiff offered to show what his face looked like at the date of trial or at any other time subsequent to the date of his accident.
Only the plaintiff and his wife testified at trial as to the scars that were then upon the plaintiff's face. The plaintiff testified he had a scar under his left eye one inch *505 long and later said it was two inches long. He testified he had scars adjacent to his left ear and one under his left lip that extended to his chin. Plaintiff's wife testified that the scars upon her husband's face were the result of the accident. This non expert testimony does not accurately describe the size of plaintiff's scars nor does it indicate to what extent they have detracted from the appearance of plaintiff's face and caused disfigurement. There was of course no expert testimony as to the possibility of improving the existing scarring of plaintiff by further plastic surgery which was alluded to by Dr. Chidlow in his letter to the defendant of February 23, 1982 and in his deposition of October, 1982.
The plaintiff testified at trial that he had lost all of his upper teeth in the accident. The petition contained no reference to the loss of the teeth and there is no evidence in the record that the defendant was ever aware before trial that the plaintiff had lost his upper teeth in the accident.
The trial judge in his reasons for judgment dictated into the record awarded the plaintiff the maximum weekly compensation under R.S. 23:1221(4)(p) based upon the scarring and the damage to his teeth.[7] It is therefore not clear what award the trial judge would have given the plaintiff for only the scarring upon his face which no doubt the trial judge evaluated by observing the plaintiff at the time he testified in court.
The trial judge denied penalties upon a finding of fact that the defendant didn't know how the plaintiff's scarring would be treated based upon the doctor's statement. This finding necessarily refers to the fact that the permanent scarring referred to by the doctor was subject to further improvement during the 11 months following the doctor's last examination and upon maximum improvement to further improvement by plastic surgery. The trial court in effect found the defendant could not tell if the plaintiff was going to be seriously permanently disfigured at the time the defendant terminated compensation benefits.
The evidence establishes that the plaintiff had serious facial lacerations in his compensable accident but it fails to establish the extent of serious permanent disfigurement the scars resulting from these injuries created upon the plaintiff's face. The defendant apparently concluded by October 4, 1982 that the extent of this permanent scarring was such that there would at least be some degree of disfigurement because at this time it paid the plaintiff $5,500. This factor was no doubt considered by the trial judge in his determination to deny penalties. We cannot find the trial judge was clearly wrong in finding that the defendant was not arbitrary and capricious in earlier failing to make a payment of benefits for permanent scarring and in failing to make a larger payment to the plaintiff before the case was tried. The information available to defendant before suit was filed and before trial had left the extent of plaintiff's scarring uncertain. The defendant was entitled to have its day in court for the purpose of determining what further worker's compensation benefits were owed plaintiff.
AFFIRMED at appellant's cost.
NOTES
[1] This check represented minimum benefits of $55.00 per week for 100 weeks. We base our statement that the check was apparently accepted on the fact that the judgment reflects a credit for this amount (see footnote 3 infra). Plaintiff has not questioned the award.
[2] The judgment gives defendant a credit of $6,833.28. This figure represents the $1,333.28 paid plaintiff while he was off work and the $5,500.00 tendered to plaintiff.
[3] R.S. 22:658 provides:

All insurers issuing any type of contract other than those specified in R.S.22:656 and 22:657 shall pay the amount of any claim due any insured including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950 within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest. Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney's fees for the prosecution and collection of such amount. Provided, that all losses on policies covering automobiles, trucks, motor propelled vehicles and other property against fire and theft, the amount of the penalty in each of the above cases shall be 25% and all reasonable attorney's fees.
[4] The defendant also contended that if any benefits were owed that there was a question as to the number of weeks these benefits would be owed. This contention is totally without merit. The compensation period under 23:1221(4)(p) is established at 100 weeks. The trial court has no discretion to set a lower number of weeks. The trial court has discretion as to the amount of each weekly benefit to which the claimant is entitled. Odom v. Atlantic Oil Producing Co., 162 La. 556, 110 So. 754 (1926); Macaluso v. Schill-Wolfson, Inc., 56 So.2d 429 (La.App. Orleans 1952); Golden v. Starns-McConnell Lumber Corporation, 172 So.2d 78 (La.App. 1st Cir. 1965); Hamilton v. Georgia Pac. Corp., 344 So.2d 400 (La.App. 1st Cir.1977). See also, Malone and Johnson, Workers' Compensation Law and Practice, 2d ed. (1980), § 283, pp. 657-658.
[5] Benefits payable under the schedules provided in 23:1221(4) are not contingent on inability to work. Cannizzaro v. Great American Insurance Company, 223 So.2d 704 (La.App. 4th Cir.1969).
[6] He did not state what date in January but we note that his letter to the adjuster written February 23, 1982 stated that he last saw plaintiff January 4, 1982.
[7] "... the Court is of the opinion that this man, with his scarring and his damage to his teeth, is entitled to the maximum benefits as provided by the act subject to the credits for the sums paid and with interest there on from judicial demand. I do think from the evidence here and from what the doctor's statement was at that time, there was no denial of this man's claim for the scarring that appears to the Court at any time. It was a matter of how severe and how the scarring would be treated. Therefore, I would deny the attorney's fees and penalties."